## A. C. KREIPKE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10716.   Promulgated July 29, 1927.

1. The petitioner was engaged in the general contracting business. He erected under contracts buildings, power plants, and other structural work for the State of Oklahoma and private citizens. His duties were prescribed and his compensation fixed by the contracts. *Held*, that the petitioner was not an officer or employee of the State of Oklahoma and the compensation paid to him by the State was subject to Federal income tax.

2. Upon the evidence, *held* that the petitioner was justified in charging off as a bad debt in 1922 an amount of $12,502.46, representing expenditure made by him in 1922 for labor and materials in commencing the erection of certain additions and alterations to a high school building at El Reno, Oklahoma.

*Claude Collard, Esq.,* for the petitioner.
*Arthur H. Murray, Esq.,* for the respondent.

In this proceeding the petitioner seeks a redetermination of his income-tax liability for the calendar year 1922, for which the Commissioner has determined a deficiency in the sum of $9,281.23.

Two issues are presented: (1) Whether the Commissioner erred in including in the petitioner's income for the calendar year 1922 compensation received from certain contracts with the State of Oklahoma and/or its political subdivisions; and (2) whether the Commissioner erred in refusing to allow as a deduction from gross income in 1922 an amount of $12,502.46 claimed by the petitioner as a bad debt.

### FINDINGS OF FACT.

The petitioner has resided in the State of Oklahoma since the year 1900, and has been continuously engaged in the contracting business for the last 35 years. During this period, he has devoted most of his time to the erection of court houses, public school buildings and other public and private structures in the States of Arkansas, Texas, New Mexico, and Oklahoma and in the Republic of Mexico. Throughout this period, and particularly during the years from 1919 to 1922, inclusive, he maintained an organization consisting of a graduate structural engineer, a heating and plumbing engineer, an auditor, bookkeeper, stenographer and various superintendents of construction. By reason of past experience and a thorough study of the construction business the petitioner was, during the years 1919 to 1922, inclusive, familiar with the quality and nature of the materials, labor, expenses, and costs incident to the construc-

tion of both public and private buildings, and with the state laws relating thereto.

Beginning in the year 1919 and continuing throughout the years 1920, 1921, and 1922, the petitioner entered into, and consummated in the year 1922, certain contracts for the erection and construction of public buildings and other projects for the State of Oklahoma and/or its several political subdivisions, a summary description and statement of profits from which follow:

| Description: | Amount of profit |
|---|---|
| Enid Dam | $4, 541. 36 |
| Goodwell Science Hall | 2, 552. 85 |
| Livingston School Building | 2, 784. 71 |
| Repairs—State Capitol Building | 73. 68 |
| Pauls Valley Training School | 5, 024. 71 |
| Stillwater School Building | 15, 283. 25 |
| Tonkawa Wilkin Hall | 390. 04 |
| Warehouse—Adjutant General | 4, 004. 37 |
| Total | 34, 654. 97 |

Each of the above-mentioned contracts was executed on the same kind of a printed form and was similar in all essential and material respects. Each, with the one exception of the high school building at El Reno (involved in issue No. 2), provided for compensation at cost of construction plus 10 per cent.

The Pauls Valley Training School contract is set out in full as follows:

UNIFORM CONTRACT ADOPTED AND RECOMMENDED FOR GENERAL USE BY THE AMERICAN INSTITUTE OF ARCHITECTS AND THE NATIONAL ASSOCIATION OF BUILDERS

CHARLES P. NIEDER, *Architects.*

THIS AGREEMENT, Made and entered into, this seventh day of June in the year of one thousand nine hundred and twenty by and between Kreipke-Schafer Co., a co-partnership, consisting of A. C. Kreipke and Henry Schafer of El Reno, Oklahoma, party of the first part (hereinafter designated the Contractor), and The State of Oklahoma acting through the State Board of Public Affairs, party of the second part, (Hereinafter designated the Owner.)

WITNESSETH, That the Contractor in consideration of the fulfillment of agreements herein made by the Owners, agrees with the said Owners, as follows:

ARTICLE I. The Contractor under the direction and to the satisfaction of Charles P. Nieder, or owner, Architects, acting for the purposes of this contract as agents of the owner, shall and will provide all the materials and perform all the work mentioned in the specifications and shown on the drawings prepared by said Architects, for the installation of laundry equipment and other necessary repair work for the State Training School for Boys at Pauls Valley, Oklahoma, which drawings and specifications are identified by the signatures of the parties hereto.

ART. II. The Architect shall furnish to the Contractor such further drawings or explanations as may be necessary to detail and illustrate the work to be done, and the Contractor shall conform to the same as part of this contract so far as they may be consistent with the original drawings and specifications referred to and identified, as provided in Art. I.

It is mutually understood and agreed that all drawings and specifications are and remain the property of the Architect.

ART. III. No alterations shall be made in the work as shown or described by the drawings and specifications, except upon a written order of the Architects, and when so made, the value of the work added or omitted shall be computed by the architects, and the amount so ascertained shall be added to or deducted from the contract price. In the case of dissent from such award by either party hereto, the valuation of the work added or omitted shall be referred to three (3) disinterested Arbitrators, one to be appointed by each of the parties to this contract, and the third by the two thus chosen, the decision of any two of whom shall be final and binding, and each of the parties hereto shall pay one-half of the expenses of such references.

ART. IV. The Contractor shall provide sufficient, safe and proper facilities at all times for the inspection of the work by the Architects, or their authorized representatives. He shall, within twenty-four hours after receiving written notice from the Architects to that effect, proceed to remove from the grounds or buildings all materials, whether worked or unworked, and to take down all portions of the work which the Architects shall by like written notice condemn as unsound or improper, or as in any way failing to conform to the drawings and specifications.

ART. V. Should the Contractor at any time refuse or neglect to supply a sufficiency of properly skilled workmen, or of materials of the proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements herein contained, such refusal, neglect or failure being certified by the Architects, the Owner shall be at liberty, after        days' written notice to the Contractor, to provide any such labor or materials, and to deduct the cost thereof from any money then due or thereafter to become due to the Contractor under this contract; and if the Architects shall certify such refusal, neglect or failure is sufficient grounds for action, the Owner shall also be at liberty to terminate employment of the Contractor for the said work and to enter upon the premises, and take possession, for the purpose of completing the work included under this contract, of all materials, tools and appliances thereon, and to employ any other person or persons to finish the work, and to provide the materials therefor; and in case of such discontinuance of the employment of the Contractor, he shall not be entitled to receive any further payment under this contract until the said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expense incurred by the Owner in finishing the work, such excess shall be paid by the Owner to the Contractor; but if such expense shall exceed such unpaid balance, the Contractor shall pay the difference to the Owner. The expense incurred by the Owner as herein provided; either for furnishing materials or finishing the work, and any damage incurred through such default, shall be audited and certified by the Architects, whose certificate thereof shall be conclusive upon all parties.

ART. VI. The Contractor shall complete the several portions, and the whole of the work comprehended in this Agreement by and at the time or times hereinafter stated. Work shall begin at once by purchasing and assembling of

necessary materials to properly progress the work, provided that the architect, by order of the owner, shall have the right to order suspension of the work at any time he may desire.

Art. VII. Should the Contractor be obstructed or delayed in the prosecution or completion of his work by the act, neglect or default of the Owner or the Architect, or of any other Contractor, employed by the Owner upon the work, or by any damage which may happen by fire, lightning, earthquake or cyclone, or by the abandonment of the work by the employes through no fault of the Contractor, then the time herein fixed for the completion of the work shall be extended for a period equivalent to the time lost by reason of any or all causes aforesaid; but no such allowance shall be made unless a claim therefor is presented to the Architects within twenty-four hours of the occurrence of such delay. The duration of such extension shall be certified to by the Architects, but appeal from their decision may be made to arbitration, as provided in Art. III of this contract.

Art. VIII. The Owner agrees to provide all labor and materials not included in this contract in such manner as not to delay the material progress of the work and in event of failure to do so, thereby causing loss to the Contractor, agrees that he will reimburse the Contractor for such loss; and the Contractor agrees that if he shall delay the material progress of the work so as to cause any damage for which the Owner shall become liable (as above stated), then he shall make good to the Owner any such damage. The amount of such loss or damage to either party hereto shall, in every case, be fixed and determined by the Architects, or by arbitration, as provided in Art. III of this contract.

Art. IX. It is hereby mutually agreed between the parties hereto that the sum to be paid by the Owner to the Contractor for said work shall be—It is understood and agreed that the contractor shall agree with the architect on the amount and extent of the work to be performed so that the cost of such work shall not exceed the available funds as set out for General Repairs and Equipment, subject to additions and deductions as hereinbefore provided, and that such sums shall be paid in current funds by the Owner to the Contractor in installments, as follows:—The actual cost of materials, labor and expense incurred in the said work, plus ten percent as compensation for contractors service or fee. Payments shall be made by the owner to the contractor monthly as follows: During the construction of the work, the architect or an authorized representative of the owner shall, with the contractor, audit all accounts of labor, materials, freight or items of expense that form a part of the actual cost of such work, plus ten percent, for payment. Said voucher to be signed by both the architect, or owner's representative, and the contractor accompanied with the architect's certificate for such amount, which shall be presented to the State Board of Public Affairs for their audit and order on State Auditor for payment. All cost of transportation of machinery needed for the construction of this work shall be paid by the party of the first part.

The final payment shall be made within 10 days after this contract is fulfilled.

All payments shall be made upon written certificates of the Architects to the effect that such payments have become due.

If at any time there shall be evidence of any lien or claim for which, if established, the Owner of the said premises might become liable, and which is chargeable to the Contractor, the Owner shall have the right to retain out of any payment then due or thereafter to become due, an amount sufficient to completely indemnify him against such lien or claim. Should there prove to be any such claim after all payments are made, the Contractor shall refund to

the Owner all moneys that the latter may be compelled to pay in discharging any lien on said premises made obligatory in consequence of the Contractor's default.

ART. X. It is further mutually agreed between the parties hereto that no certificate given or payment made under this contract, except the final certificate or final payment, shall be conclusive evidence of the performance of this contract, either wholly or in part, and that no payment shall be construed to be an acceptance of defective work or improper materials.

ART. XI. The Owner shall, during the progress of the work, maintain full insurance on said work, in his own name and in the name of the Contractor, against loss or damage by fire, lightning, earthquake, cyclone or other casualty. The policies shall cover all work incorporated in the building, and all materials for the same in or about the premises, and shall be made payable to the parties hereto, as their interest may appear.

ART. XII. The said parties, for themselves, their heirs, executors, administrators and assigns, do hereby agree to the full performance of the covenants herein contained.

IN WITNESS WHEREOF, The parties to these presents have hereunto set their hands and seal, the day and year first above written.

In presence of

|  |  |  |
|---|---|---|
| (Sgd) | KREIPKE-SCHAFER Co. | [SEAL] |
|  | A. C. KREIPKE | [SEAL] |
|  | GEO. T. CLARK | [SEAL] |
|  | H. V. BISEL | [SEAL] |

Approved: June 12, 1920

In the actual performance of the contracts, the architect and other representatives of the State of Oklahoma and/or its political subdivisions were at times on the premises and ordered certain changes and modifications of the general plans and arrangements of construction. While general plans and specifications were used, such plans were not at all times carried out literally.

There was no fixed period of time for the completion of the work under these contracts, and the petitioner's employment thereunder extended over a period from one to three years, depending upon the time required to assemble materials and labor.

The petitioner devoted the major portion of his time to the performance of these contracts, but was at all times free to accept any other private employment.

In the performance of his prescribed duties under the terms and provisions of the contracts, the petitioner obtained prices on materials, arranged for labor for the installation of materials, looked after the general contracts in a general way, paid all labor and material bills when due and saw to it that the orders of the several state boards and other representatives of the State and its political subdivisions, were carried out.

Although under the laws of the State of Oklahoma, a general contractor is required to furnish a bond with respect to all building contracts, the purpose of said bond being to guarantee the perform-

ance of the contract by the contractor in strict conformity with plans and specifications and to indemnify the owner against unliquidated liabilities of the contractor, no contractor's bond was required of the petitioner with respect to any of the contracts.

In pursuance of the terms of the contracts, the petitioner paid all labor and material bills upon receipt of invoices therefor, after which, such invoices, having been receipted by the proper parties, were filed with the proper officers of the state or political subdivision thereof. Vouchers covering the actual costs of all labor, materials, and expenses plus 10 per cent as compensation, were then issued to reimburse the petitioner.

In performing services under these contracts, the petitioner upon the advice and with the consent of the State or political subdivision thereof, made certain subcontracts.

In carrying out these contracts and upon instructions of representatives of the State, the petitioner did not pay to the United States Treasury Department any so-called war tax on freight shipments of materials, such materials being considered the property of the State or political subdivision thereof.

As a general proposition, an independent contractor in making bids on contracts includes in his estimate 10, 12 or 15 per cent in addition to actual costs of construction to cover profits, losses and overhead expenses. At the time of making the contracts in question, the petitioner did not consider that his income therefrom was subject to a Federal income tax and such consideration was material in the making of such contracts and the fixing of the basis for and measure of his compensation.

The Commissioner determined that the petitioner's income from the contracts in the sum of $34,654.97 constituted taxable income for the year 1922.

In the month of January 1922, the petitioner entered into a contract with the District School Board of the City of El Reno, Okla., for the erection of additions and alterations to a high school building. Article IX of the agreement provides in part as follows:

ART. IX. It is hereby mutually agreed between the parties hereto that the sum to be paid by the Owner to the Contractor for said work shall be $155,000.00 (One hundred fifty-five thousand and no/100 dollars), subject to additions and deductions as hereinbefore provided, and that such sums shall be paid by the Owner to the Contractor in installments, as follows:

Ninety per cent (90%) of the value of all labor performed and material incorporated in the building and on the building site to be paid every thirty (30) days upon certificates issued by the Architects.

It is understood and agreed that the funds out of which the contractor is to be paid, are now represented by time certificates of deposit issued by the Commercial Bank of the City of El Reno, in amounts as follows: Certificates amounting to $19,000.00 due May 1st, 1922. $25,000.00 due June 1, 1922 and

$25,000.00 due the 1st of each of the succeeding months, July, August, September, October and November, and the contractor is to receive his pay in these certificates of deposit without interest, that is to say that any interest which may accrue on said certificates of deposit is to be paid to the owner.

The final payment shall be made within ten (10) days after this contract is fulfilled.

During March 1922, the Commercial Bank failed and was taken over and managed under the Oklahoma State Banking Department. The petitioner then ceased work on the contract, pending the outcome of the liquidation of the bank. Up to the time of cessation of the contract, the petitioner had expended $12,502.46 on account of materials and labor on this contract.

The petitioner, in pursuance of the terms and provisions of the contract, was entitled to receive as compensation the certificates of deposit. These he never received at any time during the year 1922 or later years. Upon personal investigation made by the petitioner in the year 1922 it developed that the certificates of deposit were worthless. They were not secured by an indemnity bond as required by law. The Commercial Bank was insolvent to the extent that holders of interest-bearing certificates of deposit issued by it would never realize anything thereon.

The petitioner, during the year 1922, ascertained that the transaction by which the school bonds were deposited with the Commercial Bank in exchange for unsecured certificates of deposit was illegal by reason of which certain officers of the bank had been indicted.

Further investigation made during the year 1922 disclosed the fact that the Commercial Bank had exchanged the District School bonds for bonds of a defunct oil company; and that the bonds of such oil company were worthless. Representatives of the school board attempted to negotiate with the petitioner for the acceptance of the bonds of said oil company in lieu of the certificates of deposit. The petitioner refused to accept such oil company bonds for the reason that the same were worthless.

The petitioner having determined from investigations that his claim against the school board in the sum of $12,502.46 was worthless, the same was charged off during the year 1922 and claimed as a deduction in his income-tax return. The Commissioner disallowed the deduction.

During the year 1923, the school board by some method unknown to the petitioner was successful in having its certificates of deposit converted into an ordinary checking account and were then in a position to realize a part of their claim against the bank. The school board, in 1923, paid the petitioner the $12,502.46 previously

advanced by him, which the petitioner reported as income in his 1923 return. During the year 1922, the petitioner had no knowledge or information that he would realize on his claim in this manner.

OPINION.

GREEN: The two issues presented in this appeal are: (1) Whether the income of $34,654.97 received by the petitioner during 1922 from the State of Oklahoma and/or its political subdivisions is taxable under sections 210, 211, 212 and 213 (a) of the Revenue Act of 1921, or whether it is nontaxable under section 1211 of the Revenue Act of 1926; and (2) whether the petitioner was justified in charging off as a bad debt in 1922 the amount of $12,502.46 expended by him in connection with the El Reno High School contract.

Section 1211 of the Revenue Act of 1926 provides that—

Any taxes imposed by the Revenue Act of 1924 or prior revenue Acts upon any individual in respect of amounts received by him as compensation for personal services as an officer or employee of any State or political subdivision thereof (except to the extent that such compensation is paid by the United States Government directly or indirectly), shall, subject to the statutory period of limitations properly applicable thereto, be abated, credited, or refunded.

Based on the facts as set out in the findings, we are of the opinion that the petitioner was neither an officer nor an employee of the State of Oklahoma or any of its political subdivisions. The facts in this case are practically on all fours with the facts in *Fred H. Tibbetts*, 6 B. T. A. 827, in which we held that certain compensation received by Tibbetts from the State of California was taxable income and not exempt under section 1211, *supra*, and that an imposition of a tax on Tibbetts on such income did not amount to an interference with the exercise of Governmental functions by the State or its political subdivisions. What we said there is controlling here. See also *Union Paving Co.*, 6 B. T. A. 527; *Robert G. Gordon*, 5 B. T. A. 1047; *Emma B. Brunner*, 5 B. T. A. 1135. It follows that the $34,654.97 in question was taxable income to the petitioner in 1922.

Concerning the second issue, the facts show that prior to the month of January, 1922, the El Reno Board of Education of the State of Oklahoma allowed to be issued certain district school bonds for the purpose of erecting in the City of El Reno, an addition to a high school building. Such bonds were shortly thereafter deposited with the Commercial Bank of El Reno and unsecured interest-bearing certificates of deposit of said bank issued in connection therewith. In the same month, the board of education entered into a written contract with the petitioner for the erection of the additions to the school building, the contract providing that the petitioner should receive his compensation in the form of the certificates of deposit. Pursuant to the contract, the petitioner began construction work and proceeded with the same until the month of March, 1922,

at which time the affairs of the Commercial Bank were taken over by the Oklahoma State Banking Department. It having been reported that the bank was in a failed condition, the petitioner ceased construction work under the contract, up to which time he had incurred expenses and costs of $12,502.46.

During the year 1922, the petitioner made numerous efforts to realize on his claim, but without success. Investigations made during said year developed the fact that the Commercial Bank was insolvent to the extent that nothing would ever be realized by holders of its certificates of deposit, that the district school bonds had been exchanged by the Commercial Bank for worthless bonds of a defunct oil company, that certain officers of the bank and board of education had been indicted because of illegal transactions pertaining to the district school bonds and that for such reason the certificates of deposit were worthless. Having made efforts in the year 1922 to realize on his claim, the petitioner concluded that it was worthless and charged off same as a deduction for bad debts on his Federal income-tax return.

The petitioner having made repeated and unsuccessful efforts to realize on his claim and having exercised reasonable efforts to ascertain its worthlessness, the same in our opinion constitutes an allowable deduction from gross income. *Appeal of John E. Saddler*, 2 B. T. A. 1305; *Appeal of Pacific Pipe & Supply Co.*, 2 B. T. A. 870; *Appeal of Stieglitz Trieber Co.*, 1 B. T. A. 452; *Appeal of Huning Mercantile Co.*, 1 B. T. A. 130; *Appeal of T. J. Donahoe*, 2 B. T. A. 355; *Appeal of Egan & Hausman Co.*, 1 B. T. A. 556; *Appeal of C. S. Webb, Inc.*, 1 B. T. A. 269; *Appeal of Alemite Die Casting & Manufacturing Co.*, 1 B. T. A. 548.

*Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by STERNHAGEN and ARUNDELL.